IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: Testosterone Replacement Therapy Products Liability Litigation | Case No.: 14 C 1748 |
| | MDL: 2545 |
| | This Document Relates to All Cases |

| | | |
|---|---|---|
| RICHARD CHRIST AND JOAN CHRIST , | § | **COMPLAINT** |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| ELI LILLY AND COMPANY, AND | § | |
| | § | |
| ACRUX DDS PTY LTD ., | § | |
| | § | JURY TRIAL DEMANDED |
| Defendants. | § | |
| | § | |

## COMPLAINT

Plaintiffs, Richard Christ and Joan Christ ("Plaintiffs"), residing in Clark County, Nevada, by and through their undersigned counsel, Levin Simes LLP and Meyers & Flowers, LLC, by way of complaint against Eli Lilly and Company and Acrux DDS PTY LTD. (hereinafter "Defendants") allege as follows upon information and belief:

## INTRODUCTION

1.     This case involves the prescription drug Axiron, which is manufactured, sold, distributed and promoted by Defendants as a testosterone replacement therapy.

2.     Defendants misrepresented that Axiron is a safe and effective treatment for

hypogonadism or "low testosterone," when in fact the drug causes serious medical problems, including life threatening cardiac events, strokes, and thrombolytic events.

3. Defendants engaged in aggressive, direct-to-consumer and physician marketing and advertising campaigns for Axiron. Further, Defendants engaged in an aggressive unbranded "disease awareness" campaign to alert men that they might be suffering from "low T."

4. As a result of this "disease mongering," as termed by Dr. Adriane Fugh-Berman of Georgetown University Medical Center, diagnoses of Low T have increased exponentially. This has directly related to Axiron's sales increasing to over $257 million per year in 2013.

5. However, Axiron consumers and their prescribing physicians were misled as to the drug's safety and efficacy, and as a result many Axiron consumers have severe suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

## PARTIES

6. Plaintiffs Richard Christ and Joan Christ are residents of Las Vegas, Nevada.

7. Defendant Eli Lilly and Company ("Lilly") is a corporation organized and existing under the laws of the state of Indiana with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285. Lilly is engaged in the business of research, development, manufacture, and sale of pharmaceutical products throughout the world.

8. Defendant Acrux DDS PTY LTD., ("Acrux") is an Australian corporation that has its corporate offices and principal place of business at 103-113 Stanley Street, West Melbourne VIC 3003, Australia. Acrux is engaged in the development and commercialization of pharmaceutical products for sale throughout the world.

9. By way of background, in 2010 Lilly and Acrux entered into a worldwide licensing agreement for the commercialization of Axiron, originally developed by Acrux. The

drug was approved by the FDA in 2010. Since then Defendants have brought Axiron to market.

## JURISDICTION AND VENUE

10.     The jurisdiction of this Court over the subject matter of this action is predicated on 28 U.S.C. Section 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     Venue in this Court is proper pursuant to the order issued by the United States Judicial Panel on Multidistrict litigation on June 6, 2014, establishing MDL No. 2545 consolidating for pre-trial purposes all cases involving injuries arising from the use of testosterone replacement therapies before the honorable Matthew F. Kennelly in the Northern District of Illinois.

## GENERAL ALLEGATIONS

12.     This is an action is for damages brought on behalf of the Plaintiffs Richard Christ and his wife, Joan Christ. Plaintiff Richard Christ ("Plaintiff") was prescribed and used Axiron, as directed and prescribed by his physician and as sold or otherwise placed in the stream of interstate commerce by Defendants.  This action seeks, among other relief, general and special damages for injuries Plaintiff suffered as a direct result of using Axiron.

13.     Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

14.     At all times herein mentioned, Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug Axiron.

15.     At all times herein mentioned, Defendants were authorized to and regularly did conduct business within the states of Nevada and Illinois.

16.     At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiffs as described herein.

## OVERVIEW

17.     Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

18.     In 2010, in and around the time of the FDA's approval of Axiron, Defendants asserted that "up to 39% of men over 45 years of age may have testosterone levels below the normal healthy range." According to Defendants' own estimates at that time, 28 million men in seven major markets suffer from a lack of libido, which may be the result of low testosterone.

19.     When another pharmaceutical company that manufacturers a competing testosterone replacement therapy drug asked for FDA approval of its product in 2000, it asserted that hypogonadism was estimated to affect approximately "one million American men." The number of men suffering from hypogonadism increased to "up to 20 million men" by 2003.

20.     A study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone

prescription.

21.     Defendants coordinated a massive advertising campaign designed to convince men that they suffered from low testosterone. This included a national disease awareness media blitz that purported to educate male consumers about the signs of low testosterone. The marketing campaign consisted of television advertisements as well as promotional literature placed in healthcare providers' offices to be distributed to potential Axiron users.

22.     The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, fatigue, decreased libido, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

23.     Since the FDA approved Axiron, Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

24.     While running their marketing campaign, Defendants promote their product Axiron as an easy to use topical testosterone replacement therapy. Specifically, Defendants contrast their product's at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

25.     Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease of use. Although prescription testosterone replacement therapy had been available for years, as a result of Defendants' marketing efforts, millions of men who had never

been prescribed testosterone flocked to their doctors and pharmacies. As Teresa Shewman, a spokesperson for Defendant Lilly has stated, the advertisements are intended to "help educate men about low testosterone and encourage them to seek treatment."

26.     The marketing program sought to create the image and belief by consumers and physicians that low testosterone affects a large number of men in the United States and that the use of Axiron is safe for human use, even though Defendants knew this to be false had no reasonable grounds to believe this to be true.

27.     Defendants successfully joined and contributed to a robust marketing campaign for their drug.  Spending millions of dollars on advertising, Defendants' investment paid off in a return of $48 million in sales during its first year on the market alone. In 2012, Defendants earned $73.9 million in sales. In 2013, Defendants earned $257 million in sales. In general, sales of testosterone replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts.[1]

28.     There have been a number of studies suggesting that testosterone therapy in men increases the risk of heart attacks, strokes, and thrombolytic events.

29.     In 2010, a study published in the New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" reported that the study was in fact stopped due to an alarmingly high number of participants suffering serious adverse events.

30.     In another study published by the Journal of the American Medical Association (JAMA) in November 2013 titled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels," authors reported that

---

[1] Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?*, May 10, 2012, Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

testosterone therapy raised the risk of death, heart attack and stroke by approximately 30%.

31.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

32.     Two days later, on January 31, 2014, the FDA issued a Drug Safety Communication to physicians advising that the FDA was investigating the risk of stroke, heart attack, and death in men using testosterone products based on recent studies suggesting an increased risk of cardiovascular events among men using these products.

33.     And on April 11, 2014, the European Medicines Agency announced that in light of recent studies regarding the increased risk of cardiovascular events in patients using testosterone products, its Pharmacovigilance Risk Assessment Committee would be reviewing all data on the benefit-risk balance of testosterone-containing medicines to determine whether the marketing authorizations for these products should be maintained, varied, suspended, or withdrawn across the European Union.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

34.     The Food and Drug Administration approved Axiron (testosterone 2% solution) on November 23, 2010 for the treatment of adult males who have low or no testosterone. After FDA approval, Axiron was widely advertised and marketed by Defendants as a safe and effective testosterone replacement therapy.

35.      Axiron is a clear, colorless, alcohol-based solution for topical administration through the axilla, the underarm area. The active pharmacologic ingredient in Axiron is testosterone in 30 milligrams per 1.5 milliliters. Axiron also contains ethanol, isopropyl alcohol,

octisalate, and povidone.

36.     Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

37.     The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

38.     In men, testosterone levels normally begin to gradually decline after the age of thirty.

39.     The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood.  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication.  Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

40.     Axiron may produce undesirable side effects to patients who use the drug, including but not limited to, myocardial infarction, stroke, and death.

41.     In some patient populations, Axiron use may increase the incidence of myocardial infarctions and death by over 500%.

42.     In addition to the above, Axiron has been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied Axiron. Patients taking Axiron may experience enlarged prostates and increased serum prostate-specific antigen levels.

43.     Secondary exposure to Axiron can cause side effects in others. In 2009 the FDA issued a black box warning for similar testosterone replacement therapy drugs, advising patients of reported virilization in children who were secondarily exposed to the gel. Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant

women who come into secondary contact with Axiron.

44.     Defendants' marketing strategy beginning in 2010 has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known result from use of Axiron.

45.     Lilly's advertising program, sought to create the image and belief by consumers and their physicians that the use of Axiron was a safe method for alleviating symptoms such as fatigue, moodiness, decreased libido, decreased muscle mass and weight gain, had few side effects and would not interfere with users' daily lives, even though Defendants knew or should have known this was false, and Defendants had no reasonable grounds to believe this to be true.

46.     Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Axiron. Defendants deceived potential Axiron users and their physicians by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

47.     Defendants concealed material relevant information from potential Axiron users and their prescribing physicians and affirmatively sought to minimize user and prescriber concerns regarding the safety of Axiron.

48.     In particular, in the television commercials, online and print advertisements for Axiron, Defendants fail to mention any risk of stroke or cardiac events and falsely represent or imply that Defendants adequately tested Axiron and that it was a safe and effective treatment for symptoms such as fatigue, moodiness and decreased libido.

49.     As a result of Defendants' advertising and marketing, and representations about

its product, men in the United States pervasively seek out prescriptions for Axiron. Had Plaintiff and his prescribing physician known of the true nature of the risks and dangers associated with Axiron, Plaintiff would not have used, and his physician would not have prescribed, Axiron and consequently Plaintiff would not have suffered the injuries set forth in this complaint.

## SPECIFIC FACTUAL ALLEGATIONS

50.     Plaintiff Richard Christ was prescribed Axiron and used it as directed from approximately May 2012 through June 2012.

51.     Plaintiff Richard Christ was 82 years of age when he was prescribed and used Axiron for symptoms he attributed to low testosterone after viewing Defendants' advertisements.

52.     Plaintiff was very healthy prior to taking testosterone. In keeping with his healthy and proactive lifestyle, Plaintiff agreed to initiate testosterone treatment. Plaintiff and his physician relied on claims made by Defendants that testosterone had been clinically shown to safely and effectively raise testosterone levels and minimize the symptoms Plaintiff was experiencing.

53.     Following his use of Axiron, Plaintiff was diagnosed with a deep venous thrombosis and pulmonary embolism on or about July 2, 2012 which required hospitalization. As a result, for the rest of his life he must undergo regular testing, adhere to a restrictive diet, and take medication. Due to his deep venous thrombosis and pulmonary embolism he is now at a markedly increased risk of additional cardiovascular disease, cerebrovascular accidents, and death.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

54.     Plaintiff incorporates herein by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

55.     The Axiron manufactured and/or supplied by Defendants were defective due to inadequate warnings or instructions because Defendant knew or should have known that the product created significant risks of seriously bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks. The Axiron manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of Axiron, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

56.     Plaintiff, Plaintiff's prescribing physicians and health care providers, neither knew, nor had reason to know at the time of Plaintiff's use of Axiron of the existence of the aforementioned defects.  Ordinary consumers would not have recognized the potential risks or side effects for which Defendants failed to include appropriate warnings.

57.     At all times herein mentioned, Axiron was prescribed and used as Defendants intended and in a manner reasonably foreseeable to Defendants.

58.     As a result of the defective condition of Axiron, namely the lack of sufficient warnings, Plaintiff suffered injuries and damages as alleged herein.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE**

59.     Plaintiff incorporates by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

60.     At all times relevant hereto, Defendants, and each of them, had a duty to properly manufacture, design, formulate, distribute, compound, produce, process, assemble, test, inspect, research, market, label, package, prepare for use, issue warnings with respect to, promote, advertise, sell and monitor the use of Axiron, and to adequately test and warn of the risks and dangers of Axiron, both before and after sale, and to recall and suspend sales of Axiron upon discovering that the warnings and information issued in connection with Axiron were inadequate, that Defendants had failed to effectively communicate the warnings and related information concerning Axiron, or that prescribing physicians and consumers did not fully understand the risks associated with Axiron.

61.     At all times relevant hereto, Defendants, and each of them, breached their duties in that they negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, tested, inspected, researched, marketed, labeled, packaged, prepared for use, issued warnings with respect to, promoted, advertised, sold and or monitored the use of Axiron; failed to adequately test and warn of the risks and dangers of Axiron, both before and after its sale; and failed to recall and suspend sales of Axiron after becoming aware that it was defective and causing injuries and that the warnings and information issued in connection with Axiron were inadequate and had not been effectively communicated, and that prescribing physicians and consumers did not fully understand the risks associated with Axiron.

62.     Despite the fact that Defendants, and each of them, knew or should have known the Axiron caused unreasonable and dangerous side effects and injuries, Defendants continued and still continue to market Axiron to consumers, including Plaintiff, when there were safer alternative methods of treating the loss of energy, libido, erectile dysfunction, depression, loss of

muscle mass and other conditions the advertising for Axiron claims are caused by low Testosterone.

63.     Defendants, and each of them, knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as result of Defendants' failure to exercise ordinary care as described above.  Defendants' negligence was a proximate cause of the injuries, harm and economic loss that Plaintiff suffered and will continue to suffer as described above.

64.     As a result of the breach of Defendants' duties with respect to Axiron, Plaintiff suffered the injuries and damages as alleged herein.

### THIRD CAUSE OF ACTION
### FOR BREACH OF IMPLIED WARRANTY

65.     Plaintiff incorporates herein by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

66.     Prior to Plaintiff's use of Axiron, Defendants, and each of them, impliedly warranted to Plaintiff, Plaintiff's prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general, that the Axiron was of merchantable quality and safe and fit for the use for which it was intended.

67.     Plaintiff and Plaintiff's physicians and healthcare providers were, and remain, unskilled in the research, design, and manufacture of testosterone replacement therapy and reasonably relied entirely on the skill, judgment, and implied warranty of Defendants in using or prescribing Axiron.

68.     Defendants breached their warranties in that, Axiron was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that Axiron had dangerous propensities and known or knowable side effects when put to its intended use and would cause severe injuries to the user, which propensities and side effects were known or

knowable to Defendants but were not warned of by Defendants.

69.     As a result of the aforementioned breach of implied warranties by Defendants and each of them, Plaintiff suffered injuries and damages as alleged herein.

## FOURTH CAUSE OF ACTION
## FOR BREACH OF EXPRESS WARRANTY

70.     Plaintiff incorporates herein by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

71.     At all times herein alleged, Defendants, and each of them, expressly represented and warranted to Plaintiff, Plaintiff's prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, the FDA, and the public in general, by and through statements made by Defendants, their authorized agents, and sales representatives, orally and in publications, package inserts, and other written materials intended for physicians, patients, and the general public, that Axiron was safe, effective, fit, and proper for its intended use.

72.     Plaintiff's physician prescribed, and Plaintiff purchased and used Axiron in reliance upon said express warranties.

73.     In prescribing and or using Axiron, Plaintiff and Plaintiff's prescribing physicians and healthcare providers, relied on the skill, judgment, representations, and express warranties of Defendants. Said warranties and representations were false in that Axiron was not safe and was unfit for the use for which it was intended.

74.     As a result of the foregoing breach of express warranties by Defendants, and each of them, Plaintiff sustained injuries and damages as described above.

## FIFTH CAUSE OF ACTION
## FRAUD

75.     Plaintiff incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein.

76.     Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Axiron, and up to the present, willfully deceived Plaintiffs by concealing from them, Plaintiff's physicians and the general public, the true facts concerning Axiron, which the defendant had a duty to disclose.

77.     At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Axiron and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using Axiron. Defendants knew of the foregoing, that Axiron is not safe, fit and effective for human consumption, that using Axiron is hazardous to health, and that Axiron has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

78.     Defendants concealed and suppressed the true facts concerning Axiron with the intent to defraud Plaintiff, in that Defendants knew and Plaintiff physicians would not prescribe Axiron, and Plaintiff would not have used Axiron, if they were aware of the true facts concerning its dangers.

79.     As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

### SIXTH CAUSE OF ACTION
### NEGLIGENT MISREPRESENTATION

80.     Plaintiff incorporates herein by reference the foregoing paragraphs of this Complaint.

81.     From the time Axiron was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made

misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that Axiron was safe, fit and effective for human consumption. At all times mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Axiron and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

82.     The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

83.     The representations by the Defendants were in fact false, in that Axiron is not safe, fit and effective for human consumption, using Axiron is hazardous to health, and Axiron has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

84.     The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of Axiron.

85.     In reliance of the misrepresentations by the Defendants, and each of them, Plaintiff was induced to purchase and use Axiron. If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used Axiron. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

86.     As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff

suffered injuries and damages as alleged herein.

**SEVENTH CAUSE OF ACTION**
**ON BEHALF OF JOAN CHRIST**
**LOSS OF CONSORTIUM**

87.     Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

88.     At all times hereinmentioned, Plaintiff Joan Christ was the lawful spouse of Plaintiff Richard Christ .

89.     As a direct and proximate result of the above-described conduct by Defendants and the injuries sustained by Plaintiff Richard Christ, Plaintiff Joan Christ has suffered a loss of spousal consortium, companionship, society, affection, services and support.

**PUNITIVE DAMAGES ALLEGATIONS**

90.     Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth herein.

91.     The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other Axiron users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Axiron. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

92.     Prior to the manufacturing, sale, and distribution of Axiron, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers,

and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Axiron.

93.    Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Axiron and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Axiron. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Axiron knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

94.    Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

(a)    For general damages in a sum in excess of the jurisdictional minimum of this Court;

(b)    For medical, incidental, and hospital expenses according to proof;

(c)    For pre-judgment and post-judgment interest as provided by law;

(d)    For full refund of all purchase costs Plaintiff paid for testosterone;

(e)    For compensatory damages in excess of the jurisdictional minimum of this Court;

(f)     For consequential damages in excess of the jurisdictional minimum of this Court;

(g)     For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(h)     For attorneys' fees, expenses, and costs of this action; and

(i)     For such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts and as to all issues.

Dated: July 2, 2014                    Respectfully submitted,

                                       */s/ Rachel Abrams*
                                       Richard Abrams (CA # 209316)
                                       **LEVIN SIMES LLP**
                                       353 Sacramento Street, 20th Floor
                                       San Francisco, CA 94111
                                       Telephone: (415) 426-3000
                                       Facsimile: (415) 426-3001
                                       Email: rabrams@levinsimes.com
                                       (Recently admitted to NDIL general bar)

                                       */s/ Brian J. Perkins*
                                       Brain J. Perkins (IL #6283734)
                                       **Meyers & Flowers, LLC**
                                       225 West Wacker Drive, Suite 1515
                                       Chicago, IL 60606
                                       Telephone: (630) 232-6333
                                       Facsimile: (630) 845-8982
                                       Email: bjp@meyers-flowers.com

                                       **Attorneys for Plaintiff**